IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ANGELA R. BARNES,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        CASE NO. CV419-048
                                     )
THE MAYOR AND ALDERMEN OF THE        )
CITY OF SAVANNAH,                    )
                                     )
        Defendant.                   )
                                     )
_____ )

## O R D E R

Before the Court is Defendant The Mayor and Aldermen of the
City of Savannah's (the "City") Motion for Summary Judgment. (Doc.
37.) For the following reasons, the City's motion is **GRANTED IN
PART** and **DISMISSED IN PART**.

### BACKGROUND[1]

Plaintiff Angela R. Barnes, a black female, alleges that the
City discriminated and retaliated against her when it terminated
her employment with the Recorder's Court of Chatham County. (Doc.
19.) Plaintiff worked as the Clerk of Recorder's Court from March

---

[1] The relevant facts are taken principally from the City's
Statement of Undisputed Material Facts (Doc. 37, Attach. 1) and
Plaintiff's response thereto (Doc. 53, Attach. 11). Pursuant to
Federal Rule of Civil Procedure 56(e) and Southern District of
Georgia Local Rule 56.1, all material facts not controverted by
specific citation to the record are deemed admitted, unless
otherwise inappropriate. Where the parties offer conflicting
accounts of the events in question, this Court draws all inferences
and presents all evidence in the light most favorable to Plaintiff.
See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316,
1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341
(11th Cir. 2011)).

2015 until her termination in September 2016. (Doc. 37, Attach. 1 at ¶¶ 14, 116; Doc. 53, Attach. 11 at ¶ 118.) In the following sections, the Court will describe Recorder's Court and its administrative issues; Plaintiff's duties as Clerk of Recorder's Court; issues between Plaintiff and Judge Claire Cornwell-Williams; the City's investigation of Plaintiff's conduct as Clerk; the Superior Court of Chatham County's intervention in the administration of Recorder's Court; and the circumstances surrounding Plaintiff's termination.

I.   RECORDER'S COURT OF CHATHAM COUNTY

Recorder's Court serves as the court of first appearance for felonies and misdemeanors and the traffic court for the City of Savannah and the unincorporated area of Chatham County. (Doc. 43, Attach. 4 at 3.) Recorder's Court has three judges who are elected every four years. (Doc. 37, Attach. 1 at ¶ 1; Doc. 53, Attach. 11 at ¶ 1.) During the relevant time period, Judge Tammy Stokes, a black female, served as the Chief Judge of Recorder's Court. (Doc. 37, Attach. 1 at ¶ 2; Doc. 53, Attach. 11 at ¶ 2.) Judge Claire Cornwell-Williams, a white female, and Judge Harris Odell, Jr., a black male, served as the other two Recorder's Court judges. (Doc. 37, Attach. 1 at ¶ 3; Doc. 53, Attach. 11 at ¶ 3.)

It is undisputed that Recorder's Court has a history of interpersonal and administrative issues predating Plaintiff's employment. (Doc. 37, Attach. 1 ¶¶ 6-7; Doc. 53, Attach. 11 at ¶ 7.) Stephanie Cutter, City Manager, stated that she "was aware of

2

longstanding issues and dysfunction within the Recorder's Court" and "significant tension (a 'feud') between Chief Judge Tammy Stokes and Judge Claire Cornwell-Williams which impacted the Recorder's Court employees and the operation of the court." (Doc. 39, Attach. 1 at ¶ 4.) Cutter also stated that throughout her tenure "the City Manager's office received a disproportionately high volume of complaints out of the Recorder's Court . . . ." (Id. at ¶ 7.)

During the time most relevant to this order, the City could not require changes within the Court, but the City and Chatham County worked with Chief Judge Stokes to make improvements to Recorder's Court.[2] (Doc. 38, Attach. 3 at 2.) Because of the ongoing issues, Chief Judge Stokes sent a letter to Cutter on January 26, 2015 proposing that the administrative oversight of Recorder's Court be delegated to the Clerk of Recorder's Court, including "staff supervision, staff assignments, workload distribution and other administrative duties . . . ." (Doc. 39 at 2.) Chief Judge Stokes also proposed that "the Clerk's position, as in the past, come under the direct oversight of the City Manager's Office."[3]

_____

[2]    At the time, a Georgia law provided that the chief judge of Recorder's Court "shall be responsible for the supervision of the court personnel, and all employees of the court shall report to the chief judge or his or her designee." Ga. L. 1993, p. 4327.

[3]    The Court notes that on August 12, 2015, the City and Chatham County, Georgia, entered into an Intergovernmental Agreement, which stated, in part:

> Personnel assigned to the Court shall be employees of the City and shall be governed by the City's customary employment procedures . . . . This paragraph does not apply to the judges of Recorder's court so far as the

3

(<u>Id.</u>) The City agreed to this arrangement.[4] (Doc. 39, Attach. 1 at ¶ 9.)

## II.  PLAINTIFF'S DUTIES AS CLERK OF RECORDER'S COURT

Plaintiff was hired as the Clerk of Recorder's Court on March 30, 2015. (Doc. 37, Attach. 1 at ¶ 14; Doc. 53, Attach. 11 at ¶ 14.) As Clerk, Plaintiff held the second highest position in the Court's chain of command, behind only the Judges.[5] (Doc. 37, Attach. 1 at ¶ 23; Doc. 53, Attach. 11 ¶ 23.) Plaintiff testified that, when she started as Clerk, "there were a lot of operational challenges," including "a lack of policies and procedures . . . ." (Doc. 39, Attach. 3 at 26, 28.) In Plaintiff's opinion, the source of the conflict seemed to be that "Judge Williams . . . wanted the court run one way, but Judge Stokes . . . wanted it run a different way." (<u>Id.</u> at 17.)

---

City's employment procedures do not govern the hiring, firing, sanctioning or selection of any judge . . . .
(Doc. 40, Attach. 6 at 3.)

[4]  Plaintiff disputes whether Chief Judge Stokes delegated administrative authority to the City in her letter. (Doc. 53, Attach. 11 at ¶ 9.) Plaintiff points to evidence that, in February 2016, she sent Cutter an e-mail stating that Plaintiff was confused as to whether she reported to the City or to Chief Judge Stokes. (Doc. 39, Attach. 2 at 2; Doc. 53, Attach. 11 ¶ 9.) In response to Plaintiff's e-mail, Cutter stated "Court administration oversight rest [sic] with the City as delegated by [Chief] Judge Stokes. . . . Judicial oversight and direction rests with Judge Stokes." (Doc. 39, Attach. 2 at 2.) Plaintiff has not pointed to evidence that she or Chief Judge Stokes objected or responded to Cutter's e-mail.

[5]  Unlike the elected judges, Plaintiff was considered a City employee. (Doc. 37, Attach. 1 at ¶ 16; Doc. 39, Attach. 1 at ¶ 11; Doc. 53, Attach. 11 at ¶ 16.) As a City employee, Plaintiff was subject to City policies and procedures. (Doc. 39, Attach. 3 at 56.)

Plaintiff testified that one of her essential job functions was communicating regularly with the judges to facilitate court operations. (Doc. 39, Attach. 3 at 38.) Plaintiff was also responsible for communicating with court staff, attorneys, law enforcement, other courts, and the public about Recorder's Court matters. (Doc. 37, Attach. 1 at ¶ 24; Doc. 53, Attach. 11 at ¶ 24.) In addition to facilitating communication, Plaintiff was "[i]n charge of supervising staff in Recorder's Court . . . ." and hiring and firing Clerk's Office personnel. (Doc. 39, Attach. 3 at 61.)

Although Plaintiff testified that she worked with each Recorder's Court judge, Plaintiff believed that Chief Judge Stokes had supervisory authority over her. (Id. at 38.) Plaintiff attended meetings with all of the judges, but met with Chief Judge Stokes at least three times a week. (Doc. 37, Attach. 1 at ¶ 26; Doc. 53, Attach. 11 at ¶ 26; Doc. 39, Attach. 3 at 74, 96, 143.) During Plaintiff's tenure as Clerk, Shadavia Scott-Brown, a black female, served as Deputy Clerk of Recorder's Court. (Doc. 37, Attach. 1 at ¶ 83; Doc. 53, Attach. 11 at ¶ 83.)

III. ISSUES BETWEEN PLAINTIFF AND JUDGE CORNWELL-WILLIAMS

Plaintiff and Judge Cornwell-Williams's relationship was contentious from the beginning of Plaintiff's employment. For example, in April 2015, not even a month into Plaintiff's employment, Plaintiff refused to meet with Judge Cornwell-Williams unless another judge or her Deputy Clerk attended the meeting. (Doc. 41 at 3, 5.) After Plaintiff refused to meet with her, Judge

Cornwell-Williams sent an e-mail to Plaintiff, Cutter, and Sean Brandon, the City's Management Services Bureau Chief, stating that "it seems impossible for [Plaintiff] to do [her] job and for [them] to have a professional relationship when [Plaintiff] refuses to meet with [Judge Cornwell-Williams] without [] one of the other Judges present or [her] Chief Deputy Clerk." (Id. at 2.)

Another issue arose in June 2015 when Judge Cornwell-Williams asked Plaintiff to draft an order and Plaintiff refused. (Doc. 37, Attach. 1 at ¶ 39; Doc. 53, Attach. 11 at ¶ 39; Doc. 41, Attach. 1 at 3-5.) Judge Cornwell-Williams, in response, stated "the fact that you once again refuse to do a reasonable request from the Judge is just not acceptable." (Doc. 41, Attach. 1 at 2.) Cutter was copied into the e-mail exchange. (Id.)

In July 2015, Plaintiff and Judge Cornwell-Williams again had a frustrated e-mail exchange about scheduling and paying pro-tem judges.[6] (Doc. 37, Attach. 1 at ¶ 43; Doc. 57, Attach. 11 at ¶ 43.) Judge Cornwell-Williams disagreed with Plaintiff's records documenting the use of pro-tem judges and requested that Plaintiff change the records to reflect that Judge Cornwell-Williams did not use a pro-tem judge on a certain day. (Doc. 41, Attach. 2 at 4.) In response, Plaintiff told Judge Cornwell-Williams that "[t]he Pro-Tem records will remain unchanged," that Plaintiff "will not respond to any further emails on this matter," and that Judge

---

[6]     The Recorder's Court appoints pro-tem judges as temporary judges when a Recorder's Court judge cannot preside over a hearing. (See Doc. 41, Attach. 2.)

Cornwell-Williams "may discuss this issue with the Chief Judge."

(Id.)

Later that month, Judge Cornwell-Williams e-mailed Plaintiff and requested that Plaintiff "provide [Judge Cornwell-Williams] with a copy of every contempt warrant withdrawal that [she] [has] authorized in the last year." (Doc. 41, Attach. 7 at 2.) Judge Cornwell-Williams asked Plaintiff to have the information on her desk by 3:00 P.M. and thanked Plaintiff for her cooperation. (Id.) In response, Plaintiff stated:

> Based on the history of e-mails I have received from you, it seems that you are accustomed to treating the Clerk of Court with utter disrespect. . . . You may request information from me but you do not give me deadlines. Your request for copies of contempt warrants you have authorized for the last year is unduly burdensome and in any event will not be available.

(Id.) At one point in the exchange, Plaintiff also stated, "I will not comment any further on this matter. Please do not send additional emails on this topic as they will be considered harassing communications." (Id. at 6.)

In August 2015, Judge Cornwell-Williams sent an e-mail to Cutter, Brandon, and Beth Robinson, the City Human Resource Director, about an incident between Judge Cornwell-Williams and a Clerk's Office employee. (Doc. 41, Attach. 6 at 3-4.) Cutter forwarded the e-mail to Plaintiff, and, in response, Plaintiff explained her knowledge of the incident and noted that another employee had complained about "harassing treatment" from Judge

Cornwell-Williams.[7] (Id. at 3.) Cutter, in response, stated in part: "Please remember that the misconduct of a [j]udge is reported to the Chief Judge with a copy to me. Misconduct of staff should be reported to you to address appropriately." (Id. at 2.)

The following day, Plaintiff sent another e-mail to Cutter that stated, in part:

> I am becoming increasingly frustrated by Judge Williams [sic] actions which I believe rise to the level of judicial misconduct. In my opinion her daily actions are severely disrupting the Court and subjecting staff to inappropriate behavior. . . . I am willing to [initiate disciplinary action] provided that I will not be terminated or reprimanded for taking that course of action.

(Id.) In response, Cutter reiterated that "[i]t is not appropriate for you to address issues with Judge Williams" because "that is the role of the Chief Judge" and that Plaintiff should "forward in writing any issues related to [inappropriate] behavior by a [j]udge to the Chief Judge for resolution." (Id.)

In October 2015, Plaintiff e-mailed Cutter about Judge Cornwell-Williams's "conversations [with Plaintiff] about inappropriate matters . . . ." (Doc. 41, Attach. 11 at 2.) In the e-mail, Plaintiff described several statements allegedly made by Judge Cornwell-Williams, including:

- [I]f [Judge Cornwell-Williams] was the Chief Judge and there were so many white people (like there are blacks now) everyone would be in an uproar;
- [Judge Cornwell-Williams's] dislike for Shadavia [Scott-Brown] and how [Judge Cornwell-Williams] doesn't know

---

[7]   Plaintiff did not state what Judge Cornwell-Williams allegedly did to harass this employee.

what race Shadavia is and that Shadavia got offended when [Judge Cornwell-Williams] "called her black or African American or whatever the term is" . . .;

- [Judge Cornwell-Williams] as a white woman feels uncomfortable and the other white person in the Clerk's Office feels uncomfortable because they aren't [sic] many whites working for the Court/Clerk's Office
- [Plaintiff] will be held responsible for the lack of diversity in the Court.

(Id.)

In December 2015, Plaintiff sent an e-mail to Brandon informing him that Judge Cornwell-Williams refused to meet with her because Judge Cornwell-Williams believed Plaintiff was recording their meetings. (Doc. 41, Attach. 14 at 3.) In response, Brandon suggested that he attend a meeting between Plaintiff and Judge Cornwell-Williams. (Id.) Plaintiff agreed and requested that she "not meet with Judge Williams alone" because she was "very concerned for [her] personal safety." (Id. at 2.) Plaintiff testified, however, that Judge Cornwell-Williams never physically touched her; rather, she had, in the past, waived her hands and raised her voice. (Doc. 37, Attach. 1 at ¶ 63; Doc. 53, Attach. 11 at ¶ 63; Doc. 39, Attach. 3 at 122.)

In January 2016, Cutter was copied into another contentious e-mail exchange between Plaintiff and Judge Cornwell-Williams. (Doc. 42, Attach. 1 at 2-3.) In response, Cutter encouraged Plaintiff to communicate with Judge Cornwell-Williams in person. (Id.) Judge Cornwell-Williams replied: "It is slanderous and defamatory that the Clerk is saying that she can't meet with me alone. It appears raciest [sic] that [Plaintiff] only refuses to

meet with the 'white' Judge. I had hoped that our community was well past racism." (Id. at 2.) Plaintiff again refused to meet with Judge Cornwell-Williams alone, but was open to meet with Judge Cornwell-Williams in group settings. (Doc. 42 at 2.)

## IV.   FORMAL COMPLAINTS AGAINST PLAINTIFF

In February 2016, Plaintiff had two formal complaints filed against her. Catrina Perry-Brown filed the first complaint on February 4, 2016 via an e-mail to Cutter.[8] (Doc. 42, Attach. 5 at 2.) In the e-mail, Perry-Brown alleged that she was being harassed and retaliated against by Plaintiff, Scott-Brown, and Chief Judge Stokes. (Id. at 3.) Specifically, Perry-Brown alleged that Plaintiff demoted her, assigned her duties outside of her job description, did not provide her a desk, and threatened her with termination.[9] (Id. at 2-3.)

---

[8]   Plaintiff, in her response to the City's Statement of Undisputed Material Facts, alleges that Judge Cornwell-Williams actually wrote the e-mail for Perry-Brown. (Doc. 53, Attach. 11 at ¶ 84.) The e-mail was sent from Judge Cornwell-Williams's e-mail address to Renee Higgins, Cutter's secretary. Perry-Brown testified that she originally sent the complaint from her own e-mail address in August or September 2015. (Doc. 56, Attach. 3 at 4.) Perry-Brown called Higgins in February 2016 to follow-up on the complaint and Higgins indicated that she had not received the complaint. (Id.) Because Perry-Brown was afraid Plaintiff monitored her e-mails, she re-sent the e-mail from Judge Cornwell-Williams's computer. (Id.)

[9]   Perry-Brown believed Plaintiff was retaliating against her because Cutter reversed Plaintiff's decision to terminate Perry-Brown. (Doc. 42, Attach. 5 at 2.) In July 2015, Plaintiff fired Perry-Brown for allegedly recalling a warrant without a judge's approval, forging a signature, and waiving a contempt fee without authorization. (Doc. 37, Attach. 1 at ¶ 45; Doc. 53, Attach. 11 at ¶ 45.) Perry-Brown appealed her termination to the City and Cutter reinstated Perry-Brown to the Clerk's Office. (Doc. 37, Attach. 1 at ¶ 48; Doc. 53, Attach. 11 at ¶ 48.) Judge Cornwell-Williams

Judge Cornwell-Williams filed the second complaint against Plaintiff on February 17, 2016. (Doc. 42, Attach. 4 at 2.) In her letter to Cutter, Judge Cornwell-Williams primarily complained about an incident that occurred on February 9, 2016 involving Plaintiff. (Id.) On February 9, Judge Cornwell-Williams was presiding over the misdemeanor docket and she requested that Plaintiff come to the courtroom to help resolve an administrative issue. (Id.) Judge Cornwell-Williams asked Plaintiff to explain why an inmate remained in jail two weeks past his original court date and, in response, Plaintiff stated "I don't know" several times. (Id.; Doc. 39, Attach. 3 at 81.) Because Judge Cornwell-Williams continued to question Plaintiff about the issue, Plaintiff walked out of the courtroom and ignored Judge Cornwell-Williams's requests that she stay in the courtroom. (Doc. 37, Attach. 1 at ¶ 80; Doc. 53, Attach. 11 at ¶ 80.) At the time, Plaintiff thought that Judge Cornwell-Williams was trying to embarrass her and that she was afraid Judge Cornwell-Williams would put her in jail for not knowing the answer to her questions.[10] (Doc. 39, Attach. 3 at 81.) Along with her letter, Judge Cornwell-Williams also provided Cutter with two statements from attorneys who were in the courtroom during the February 9th incident and an

---

supported Perry-Brown's reinstatement. (Doc. 37, Attach. 1 at ¶ 49; Doc. 53, Attach. 11 at ¶ 49.)

[10]   Plaintiff testified that she was afraid Judge Cornwell-Williams would put her in jail because, at some time in the past, Judge Cornwell-Williams threatened to call a bailiff on Plaintiff. (Doc. 39, Attach. 3 at 82.)

incident report drafted by a Chatham County Sherriff's deputy, all of which confirmed that Plaintiff ignored Judge Cornwell-Williams's requests to stay in the courtroom. (Doc. 49, Attach. 2 at 36-38.)

In her complaint, Judge Cornwell-Williams requested that the City conduct an investigation into Plaintiff's conduct as Clerk of Recorder's Court. (Doc. 42, Attach. 4 at 2.) Judge Cornwell-Williams reasoned that Plaintiff showed "utter disrespect . . . to a sitting judge in open [c]ourt . . . ." and that "when it is impossible to even have a meeting with the Clerk and another staff member in [her] office the time has come for this type of conduct to be formally investigated and appropriate actions taken." (Id.) Judge Cornwell-Williams stated that any claim by Plaintiff about her personal safety is "libelous." (Id. at 2-3.) Judge Cornwell-Williams also alleged that Plaintiff required Clerk's Office employees to sign a confidentiality agreement stating that "if they discuss issues in the Clerk's Office with anyone other than [Plaintiff] or Scott-Brown, they could be terminated" and that Plaintiff "orally told employees that they may not speak to [Judge Cornwell-Williams] about anything at all that involves the Clerk's office." (Id. at 3.)

V.   INVESTIGATION OF THE COMPLAINTS AGAINST PLAINTIFF

After reviewing the complaints, Cutter decided to conduct a formal investigation of the allegations against Plaintiff and Scott-Brown, the Deputy Clerk. (Doc. 42, Attach. 8 at 2.) The City

12

hired Maurey Bowen, a local employment attorney, to investigate the complaints and the ongoing interpersonal conflicts between Recorder's Court personnel.[11] (Doc. 37, Attach. 1 at ¶ 87; Doc. 53, Attach. 11 at ¶ 87.) On March 4, 2016, Cutter sent a letter to Chief Judge Stokes about the City's decision to investigate the complaints. (Doc. 42, Attach. 8 at 2.) The letter stated:

> After many attempts to facilitate and encourage better communication and working relationships between the administrative and judicial staff as well as attempts to foster better communications and administrative oversight within the Clerk's Office, it appears that there are still serious concerns that continue to negatively impact Court operations. As a result, the City Attorney, per my request, has engaged Maury Bowen to conduct a thorough investigation of complaints received. Upon completion of the investigation and receipt of the final report, Sean Brandon, Bureau Chief, will take appropriate administrative action. Any findings related to the Court's judicial operations will of course be forwarded to you for resolution.

(Doc. 42, Attach. 8 at 2.)

Bowen's investigation spanned several months, in which time she interviewed forty-seven individuals, including all Recorder's Court Clerk's Office employees, several former Recorder's Court Clerk's Office employees, Chief Judge Stokes, Judge Cornell-Williams, Judge Odell, and Plaintiff.[12] (Doc. 37, Attach. 1 at ¶

---

[11]    It is undisputed that, although Chief Judge Stokes had supervisory authority over Plaintiff, the City had inherent authority to investigate the complaints against Plaintiff. (Doc. 37, Attach. 1 at ¶ 88; Doc. 53, Attach. 11 at ¶ 88.)
[12]    Throughout Bowen's investigation, issues continued to arise between Plaintiff and Judge Cornwell-Williams. (Doc. 37, Attach. 1 at ¶ 92; Doc. 53, Attach. 11 at ¶ 92.)  In one instance, Plaintiff refused to send Rahnaan Fleming, a Clerk's Office employee, to Judge Cornwell-Williams's courtroom in response to a request for assistance from Judge Cornwell-Williams. (Doc. 42, Attach. 11 at

90; Doc. 53, Attach. 11 at ¶ 90; Doc. 42, Attach. 9 at 5-6.) Bowen also reviewed at least twenty-six documents during her investigation, including the numerous e-mail exchanges between Plaintiff, Judge Cornwell-Williams, and Cutter. (Doc. 37, Attach. 1 at ¶ 97; Doc. 53, Attach. 1 at ¶ 97; Doc. 42, Attach. 9 at 4-5.) Bowen reduced her investigation to a 133-page report (the "Report") which she provided to Bret Bell, Deputy Assistant to the City Manager, on August 4, 2016. (Doc. 42, Attach. 9.)

The Report details that there were "two clear factions within the Recorder's Court: the 'Judge Stokes side' and the 'Judge [Cornwell-Williams] side.' " (Id. at 17.) The Report also states that Chief Judge Stokes's feud with Judge Cornwell-Williams was potentially based on race and that those employees on "Judge Stokes's side," including Plaintiff and Scott-Brown, treated white employees on "Judge Cornwell-Williams's side" unfavorably.[13] (Id. at 18-19, 20.) Additionally, the Report concludes that Chief Judge Stokes, Scott-Brown, and Plaintiff retaliated against Catrina

---

2.) In her e-mail to Judge Cornwell-Williams, Plaintiff stated that Fleming would not be available for Judge Cornwell-Williams's courtroom due to concerns about harassment. (Id.) Judge Cornwell-Williams, in response, stated that "it is impossible to do [her] job when the court service personnel refuse to come to Court and the Clerk supports the employee." (Id.) Plaintiff noted that another Clerk's Office employee could assist Judge Cornwell-Williams if the employee was available, but Plaintiff did not copy this employee to the e-mail exchange. (Id.)

[13] Specifically, the Report found that Chief Judge Stokes and her management showed favoritism towards employees who were perceived to be on "Judge Stokes's side." (Doc. 42, Attach. 9 at 20.) Additionally, the Report found that "Judge Stokes and her management team targeted certain employees who were seen as being on Judge [Cornwell-Williams's] side." (Doc. 42, Attach. 9 at 23.)

14

Perry-Brown, the data quality analyst that Plaintiff terminated in July 2015, by ignoring her, refusing to provide her a desk or a phone, and inappropriately altering her job duties. (Id. at 14, 24-25.) Finally, the Report states that Judge Cornwell-Williams was routinely excluded from Clerk's Office matters by Chief Judge Stokes, Scott-Brown, and Plaintiff.[14] (Id. at 26.)

The Report ultimately concludes that the evidence supported Judge Cornwell-Williams and Perry-Brown's allegations against Plaintiff. (Doc. 37, Attach. 1 at ¶ 99; Doc. 53, Attach. 11 at ¶ 99.) Specifically, in relation to Judge Cornwell-Williams's complaints, the Report states that:

1. Judge Cornwell-Williams's complaint about Plaintiff disrespecting her in court is sustained "because the evidence collected shows that [Plaintiff] ignored Judge Williams's request for her to stay in the courtroom and, instead, turned and walked out of the courtroom during open court . . . ."
2. Judge Cornwell-Williams's complaint about Plaintiff "expressing negative information about Judge Williams's character, and instructing Recorder's Court employees not to discuss Recorder's Court business with Judge Williams" is sustained.[15]

---

[14] The Report made several other findings about the issues within Recorder's Court, but the Court finds the issues stated above to be the most relevant.

[15] Plaintiff testified that she did require Clerk's Office employees to sign confidentiality agreements. (Doc. 39, Attach. 3 at 89-90.) Plaintiff, however, also testified that she implemented these agreements because Sala Menaya, an HR employee, recommended that Plaintiff have employees sign confidentiality agreements to mitigate the ongoing problems in the Clerk's Office. (Id. at 89.) Specifically, Plaintiff told Menaya that Clerk's Office employees were telling Judge Cornwell-Williams issues that they were not telling Plaintiff about. (Id. at 90.) Plaintiff further testified that she told Chief Judge Stokes about her plan to have employees sign confidentiality agreements and Chief Judge Stokes agreed to the idea. (Id. at 90.)

3. Judge Cornwell-Williams's complaint that Plaintiff "hampered her ability to conduct Recorder's Court business because she is unable to obtain needed information about pending cases from Recorder's Court employees . . ." is sustained.

4. Judge Cornwell-Williams's complaint that her exclusion from Recorder's Court Clerk's office by Plaintiff is racially motivated is sustained because racially-charged comments were made by Clerk's Office employees and because white applicants were turned away from interviews in the Clerk's Office.

(Doc. 42, Attach. 9 at 7-12.) The Report also states that Chief Judge Stokes and Scott-Brown "engaged in a pattern of providing negative information to [Plaintiff] for the purpose of negatively impacting the Clerk's opinion of Judge [Cornwell-Williams]" and that "Scott-Brown may have significant impact on the decisions made by [Plaintiff]." (Id. at 12.)

Bell reviewed the Report and concluded that Plaintiff had committed seven violations of City policies, including:

1. Plaintiff walked out of the courtroom while Judge Cornwell-Williams was speaking to her.

2. Plaintiff repeatedly expressed negative information about Judge Cornwell-Williams's character and instructed Recorder's Court employees not to discuss Recorder's Court business with Judge Cornwell-Williams.

3. Plaintiff hampered Judge Cornwell-Williams's ability to conduct Recorder's Court business because she was unable to obtain needed information about pending cases from Recorder's Court employees.

4. Plaintiff tolerated race as a factor in some Recorder's Court work-related matters, including hiring decisions.

5. Plaintiff targeted Perry-Brown due to her relationship with Judge Cornwell-Williams.

6. Plaintiff retaliated against Perry-Brown by demoting her and placing her in a temporary workstation.

7. Plaintiff exhibited systemic favoritism in Recorder's Court.

(Doc. 42, Attach. 13 at 4-6.) Based on these policy violations, Bell recommended that Plaintiff be suspended prior to dismissal.[16] (Id. at 6.) Bell also concluded that Scott-Brown had committed nine City policy violations and Bell also recommended that Scott-Brown be suspended prior to dismissal. (Id. at 7-8.)

On August 5, 2016, Cutter sent Bell's memorandum and the Report to Chief Judge Stokes. (Id. at 2.) Cutter acknowledged that Chief Judge Stokes had supervisory authority over Recorder's Court personnel, but also noted that despite Chief Judge Stokes's oversight, Recorder's Court employees are employees of the City and "are all subject to the personnel rules and regulations of City Government." (Id.) Cutter recommended that Chief Judge Stokes suspend and dismiss Plaintiff and Scott-Brown. (Id.) Chief Judge Stokes refused to suspend or terminate Plaintiff or Scott-Brown. (Doc. 37, Attach. 1 at ¶ 107; Doc. 53, Attach. 11 at ¶ 106; Doc. 39, Attach. 3 at 149.)

## VI.   THE SUPERIOR COURT OF CHATHAM COUNTY'S INTERVENTION

In early August 2016, the Savannah Morning News filed an Open Records Request seeking a copy of the Report. (Doc. 43, Attach. 2 at 2.) Chief Judge Stokes denied the request until she could conduct her own investigation into the allegations against

---

[16]   Pursuant to City policy, employees are suspended for two days prior to termination. (Doc. 43, Attach. 6 at 2.) The employee has twenty-four hours from the time the employee receives the suspension to appeal her dismissal. (Id.) If the employee does not appeal, the dismissal automatically takes effects two days after the date of suspension. (Id.)

Plaintiff and Scott-Brown. (Id. at 2, 7.) However, on August 31, 2016, the Superior Court of Chatham County found that Chief Judge Stokes erred in prohibiting the release of the Report and the Superior Court authorized the City to comply with the Open Records Request. (Id. at 12.)

On September 8, 2016, after reviewing the Report, the Superior Court of Chatham County issued a Writ of Prohibition, which temporarily suspended the administrative authority of Chief Judge Stokes. (Doc. 43, Attach. 4 at 1.)[17] The writ states, in part:

> The Judges of Superior court of the Eastern Judicial Circuit have been aware of serious issues affecting [the Recorder's Court] for well over a year. . . . To put it bluntly, the [R]eport shows that Recorder's Court is currently in a state of crisis. A review of the [R]eport reveals a state of dysfunction within Recorder's Court such that it is unable to operate in a manner consistent with its duty to uphold justice and its responsibilities to the public. The [R]eport describes what can only be considered as an internecine war between two judges of Recorder's Court which has lead to the clerk refusing to make court records available, the improper incarceration of citizens due to docketing problems in the clerk's office and excessive turnover of personnel from the clerk's office. . . . [T]he clerk and personnel within the clerk's office have interfered with the ability of one of the judges to carry out her duties. The report plainly describes a clerk's office that, at best, is unable to operate efficiently, and, at worst, is actively obstructing justice. Even more troubling, the actions, or in some cases, refusal to act, by the clerk's office have been either tolerated or encouraged by the Chief Judge of Recorder's Court.

---

[17] For purposes of this order, the Court will cite to the City's copy of the Superior Court's Writ. However, the case citation for the writ is In Re: Recorder's Court of Chatham Cty. & Judge Tammy Stokes, No. CV16-0796-WA (Chatham Cty. Super. Ct. Sept. 8, 2016).

(Id. at 1-2.) The Superior Court designated Dan Massey, the Clerk of Superior Court, as the supervisor of all Recorder's Court personnel and directed Massey to assume administrative responsibilities for the management of the Recorder's Court Clerk's Office.[18] (Id. at 5.)

On the same day, Massey notified Plaintiff that she was suspended prior to dismissal for violation of City policies.[19] (Doc. 43, Attach. 5 at 2.) In making his decision, Massey reviewed the Report, but also relied on his own experiences with Plaintiff during her tenure as Clerk of Recorder's Court. (Doc. 40, Attach. 8 at ¶¶ 6, 14.) Massey opined that Plaintiff "was not an effective administrator" and did not "have good working knowledge of Recorder's Court operations . . . ." (Id. at ¶ 6.) In his declaration, Massey also described several other issues that he witnessed during Plaintiff's employment as Clerk, including: (1) mishandling of numerous bonds; (2) significant delays in transferring cases from Recorder's Court to State or Superior Court; (3) inaccurate and incomplete paperwork; (4) frequent complaints and reports of dysfunction, poor recordkeeping, and delays from current and former Recorder's Court employees, lawyers, law enforcement personnel, and members of the public; (5) significant delays in scheduling cases and mailing notices to

---

[18]   Massey previously served as Clerk of Recorder's Court. (Doc. 40, Attach. 8 at ¶ 2.)
[19]   Massey also suspended Scott-Brown prior to dismissal. (Doc. 37, Attach. 1 at ¶ 115.)

defendants; and (6) rapid turnover of Recorder's Court employees. (Id. at ¶¶ 6-10.)

On September 9, 2016, Plaintiff and Scott-Brown filed a Joint Notice of Appeal of Suspension and Termination. (Doc. 44 at 2.) In her notice of appeal, Plaintiff argued that (1) Massey did not have lawful authority to discipline her; (2) her suspension and termination were in retaliation for opposing discrimination; and (3) the City's investigation was controlled by Judge Cornwell-Williams. (Id. at 3-4.) Plaintiff also argued that she did not violate any City policies and argued that she did not retaliate against Perry-Brown. (Id. at 4-9.)

On September 14, 2016, Peter Shonka, the Assistant City Manager, conducted a hearing on Plaintiff's appeal.[20] (Doc. 53, Attach. 11 at ¶ 119; Doc. 44, Attach. 1 at ¶ 2.) At the hearing, Plaintiff and Massey were each permitted to give a statement and present evidence. (Doc. 44, Attach. 1 at ¶ 6.) Based on the evidence presented at the hearing, Shonka found that Plaintiff had violated several City policies in the management of Recorder's Court and that "it is clear the court is not functioning as it should be and that new leadership is needed." (Id.; Doc. 44,

---

[20]   In her appeal, Plaintiff requested that Cutter and Bell recuse themselves from the appeal decision, in part, because "Bell made recommendation[s] based on illegal and extraordinarily biased and false investigative report . . . and [] Cutter concurred with his recommendation." (Doc. 44 at 2.) Cutter and Bell complied.

Attach. 2 at 2.) Shonka ultimately upheld Massey's decision to terminate Plaintiff's employment.[21] (Id.)

## VII. STAY OF WRIT OF PROHIBITION

Plaintiff, Chief Judge Stokes, and Scott-Brown appealed the Superior Court of Chatham County's Writ of Prohibition. (Doc. 44, Attach. 3 at 2.)[22] On September 15, 2016, the Supreme Court of Georgia stayed the Superior Court's Writ of Prohibition pending Chief Judge Stokes, Plaintiff, and Scott-Brown's appeal of the Writ. (Id. at 2.) In its order, the Supreme Court of Georgia stated: "Like the judges of the Superior Court, we too are troubled by the reports about the Recorder's Court." (Id. at 3.) However, the Supreme Court of Georgia found "that a substantial question exists about the lawfulness of the [Superior Court's] writ."[23] (Id.)

Subsequently, on September 20, 2016, Chief Judge Stokes, through her attorney, attempted to reemploy Plaintiff and Scott-

---

[21]   Plaintiff, in her response to the City's statement of material facts, alleges that she was actually terminated on September 9, 2016 when Massey suspended her for two days prior to dismissal. (Doc. 53, Attach. 11 at ¶ 118.) However, in her December 21, 2016 EEOC charge, Plaintiff states that she was terminated when Shonka upheld Massey's decision on September 14, 2016. (Doc. 44, Attach. 7 at 2.) Accordingly, for purposes of this Order, the Court will consider September 14 as the day Plaintiff was terminated.
[22]   For purposes of this order, the Court will cite to the copy of the Supreme Court of Georgia's opinion that the City filed on the record.
[23]   The appeal of the Writ's lawfulness was ultimately dismissed as moot by the Supreme Court of Georgia because the Writ contained a sunset provision rendering it ineffective six weeks after its issuance. (Doc. 45, Attach. 1 at 2-3.)

Brown.[24] (Doc. 53, Attach. 11 at ¶ 127; Doc. 44, Attach. 4 at 2; Doc. 38 at ¶ 24.) The City, in an e-mail from City Attorney Brooks Stillwell, declined Chief Judge Stokes's request to rehire Plaintiff and Scott-Brown and asserted that Plaintiff and Scott-Brown "were properly terminated for policy violations." (Doc. 44, Attach. 4 at 2.)

VIII. <u>PLAINTIFF'S EEOC CHARGES AND CURRENT LAWSUIT</u>

Plaintiff filed three charges with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff alleges that she filed her first EEOC charge on March 18, 2016, however, Plaintiff did not provide the Court with a copy of this charge. (Doc. 19 at ¶ 82.) Plaintiff filed her second EEOC charge on July 29, 2016 alleging race discrimination and retaliation. (Doc. 44, Attach. 5 at 2.) Plaintiff filed her third EEOC charge on December 21, 2016 alleging race discrimination and retaliation. (Doc. 44, Attach. 7 at 2.) In her third charge, Plaintiff alleged that she was subject to discrimination and retaliation by the City on September 14, 2016 when the City terminated her employment. (<u>Id.</u>) The EEOC

---

[24]   Also on September 20, 2016, Chief Judge Stokes issued her own investigative report on the issues between Plaintiff and Judge Cornwell-Williams and on the administrative issues affecting Recorder's Court. (<u>See</u> Docs. 46-48.) In her report, Chief Judge Stokes alleged that the City should have directed the complaints against Plaintiff to her for investigation and resolution. (Doc. 46 at 4.) Chief Judge Stokes also alleges that Bowen's report was flawed, improper, and incomplete. (Doc. 46 at 3.) Chief Judge Stokes concluded that Judge Cornwell-Williams' complaints against Plaintiff were not sustained by evidence, with the exception that "[Plaintiff's] departure from the courtroom was less than 100% professional." (Doc. 46 at 27-29.)

referred Plaintiff's charge to the Department of Justice ("DOJ"), and the DOJ declined to file suit on November 30, 2018 and issued Plaintiff her notice of right to sue. (Doc. 49 at 2.)

On February 28, 2019, Plaintiff filed suit in this Court. (Doc. 1.) Plaintiff filed her Second Amended Complaint on August 20, 2019. (Doc. 19.) In her Second Amended Complaint, Plaintiff advances five counts against the City related to her employment and termination. In Counts One and Three, Plaintiff alleges that the City discriminated against her based on her race in violation of Title VII and 42 U.S.C. § 1981, respectively. (Doc. 19 at 12-16.) In Counts Two and Four, Plaintiff alleges that the City retaliated against her after she engaged in protected activity in violation of Title VII and 42 U.S.C. § 1981, respectively. (Id. at 14-18.) Finally, in Count Five, Plaintiff alleges that the City violated the Georgia Whistleblower Act. (Id. at 19.) On February 24, 2020, the City filed a Motion for Summary Judgement on all of Plaintiff's claims. (Doc. 37.) Plaintiff has opposed the City's motion. (Doc. 53.)

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the

24

nonmoving party. <u>Matsushita</u>, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u>, 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. <u>See</u>, <u>e.g.</u>, <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

I.   <u>TITLE VII PERSONAL STAFF EXEMPTION</u>

As an initial matter, the City argues that Plaintiff is not an employee for purposes of Title VII. (Doc. 37 at 14.) Specifically, the City contends that Plaintiff was a member of Chief Judge Stokes's personal staff and, therefore, was not an employee for Title VII purposes. (<u>Id.</u>) In response, Plaintiff notes that the City admitted Plaintiff was an employee for Title VII purposes in its Answer. (Doc. 53 at 2.)

Title VII prohibits employers from discriminating against individual employees because of the employee's race, color, religion, sex, or national origin. <u>See</u> 42 U.S.C. § 2000e-2(a). The term "employee" is defined under Title VII as

> an individual employed by an employer, except that the
> term 'employee' shall not include any person elected to

25

public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f). Title VII does not define the term "personal staff," and the Eleventh Circuit has not addressed whether a clerk of court is considered the personal staff of an elected judge. "Courts have construed the personal staff exemption narrowly, however, because 'Congress intended . . . the . . . exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official.' " Milliones v. Fulton Cty. Gov't, No. 1:12-CV-3321-TWT, 2013 WL 2445206, at *4 (N.D. Ga. June 5, 2013) (quoting Teneyuca v. Bexar Cty., 767 F.2d 148, 150 (5th Cir. 1985)); see also Wall v. Coleman, 393 F. Supp. 826, 829-31 (S.D. Ga. 1975). "The term 'personal staff' 'embodies the general and traditional proposition that positions of confidentiality, policy-making, or acting and speaking on behalf of the chief are truly different from other kinds of employment.' " Milliones, 2013 WL 2445206, at *4 (quoting Shahar v. Bowers, 114 F.3d 1097, 1104 n.15 (11th Cir.1997)).

"The determination of whether an individual is part of an elected official's personal staff involves a 'highly factual' inquiry that focuses on 'the nature and circumstances of the employment relationship between the complaining individual and the elected official . . . .' " Milliones, 2013 WL 2445206, at *4 (quoting Teneyuca, 767 F.2d at 152); Frazier v. Smith, 12 F. Supp.

26

2d 1362, 1367 (S.D. Ga. 1998). When making such determinations, courts have considered the following non-exhaustive list of factors:

> (1) Whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

Laurie v. Ala. Ct. of Crim. App., 88 F. Supp. 2d 1334, 1338 (M.D. Ala. 2000) aff'd, 256 F.3d 1266 (11th Cir. 2001) (citations omitted); Milliones, 2013 WL 2445206, at *4. "[C]ourts rarely decide the personal staff exemption issue even at the summary judgment stage, '[s]ince this determination demands extensive factual analysis . . . .'" Milliones, 2013 WL 2445206, at *4 (quoting Frazier v. Smith, 12 F. Supp. 2d at 1367; see also Teneyuca, 767 F.2d at 152 (noting that the determination of the "personal staff" exception "does not lend itself well to disposition by summary judgment").

Construing the facts in the light most favorable to Plaintiff, the Court cannot find as a matter of law that Plaintiff was a member of Chief Judge Stokes's personal staff. Although Chief Judge Stokes possessed the authority to hire and terminate Plaintiff and frequently met with Plaintiff, these facts alone are insufficient to conclude that Plaintiff was a member of her personal staff. See

Hart v. Edwards, No. 3:07-CV-64(CDL), 2009 WL 691069, at *6 (M.D. Ga. Mar. 11, 2009) (determining that a sheriff's authority to hire and terminate the plaintiff did not make the plaintiff a member of his personal staff). Plaintiff testified that her primary responsibilities included communicating regularly with all of the judges and facilitating court-wide operations. See Laurie, 88 F. Supp. 2d at 1348 (finding staff attorneys exempt personal staff in part because "the staff attorneys perform work and are answerable only to the judge for whom they work, not the court as a whole"). Plaintiff was not only accountable to Chief Judge Stokes nor did Plaintiff only represent Chief Judge Stokes to the public. Rather, Plaintiff was required to support and represent all three Recorder's Court judges. Because the City has not shown as a matter of law that Plaintiff falls within the personal staff exemption, the City is not entitled to summary judgment based upon the exemption.

## II.  RACE DISCRIMINATION CLAIMS

Next, the City contends that it is entitled to summary judgment on Plaintiff's race discrimination claims. (Doc. 37 at 1.) In Counts One and Three of Plaintiff's Second Amended Complaint, Plaintiff alleges that the City discriminated against her based on her race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 19 at 12-16.) Although separately listed in her complaint, the analyses for Title VII and § 1981 claims are functionally the same. See Snider v. Jefferson State Cmty. Coll.,

344 F.3d 1325, 1331 (11th Cir. 2003) ("[W]hen utilized as parallel remedies for such discrimination, the elements of a claim under each are identical."); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework"); Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1335 n.7 (11th Cir. 2015) ("Though [the plaintiff] brought claims under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983 as well, their fates rise and fall with his Title VII claim.").

Title VII prohibits an employer from intentionally "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Discrimination claims brought under Title VII are typically categorized as either mixed-motive or single-motive claims." Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016). An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on race, "was a motivating factor for an adverse employment action, even though other factors also motivated the action." Id. (internal quotations omitted). In contrast, single-motive claims require a plaintiff to show that bias was the true reason for the adverse action. Id. "Single-motive and mixed-motive

discrimination claims can be established with either direct or circumstantial evidence." Id.

In this case, Plaintiff asserts that the City investigated her and terminated her employment because of her race.[25] Plaintiff alleges discrimination under both a single-motive theory and a mixed-motive theory.[26] (See Doc. 19 at ¶ 74; Doc. 53 at 7.)

---

[25]    In her response, Plaintiff does not clearly allege how the City discriminated against her. Based on the Court's review of her Second Amended Complaint, Plaintiff seems to allege that the City discriminated against her on two instances: (1) when the City investigated Plaintiff; and (2) when Shonka, a City Manager, upheld Plaintiff's termination. (Doc. 19 at ¶¶ 74, 96.) It is undisputed that the City did not terminate Plaintiff's employment—Plaintiff admits that Dan Massey, Clerk of Superior Court, initially terminated her on September 9, 2016. (Doc. 53, Attach. 11 at ¶¶ 116, 118.) Massey was not a City employee, but he terminated Plaintiff after the Superior Court temporarily suspended the administrative authority of Chief Judge Stokes and designated Massey as the supervisor of all personnel of Recorder's Court. (Doc. 44, Attach. 3 at 2.) Although there remains an open question as to whether the Superior Court's exercise of supervisory authority over the administrative affairs of Recorder's Court was lawful, that question is not before the Court. The question before the Court is whether the City unlawfully terminated Plaintiff. Viewing the facts in the light most favorable to Plaintiff, Plaintiff would not have been terminated had Peter Shonka, Assistant City Manager, not upheld Massey's decision. Moreover, in her December 21, 2016 EEOC charge, Plaintiff alleged that discrimination and retaliation occurred on September 14, 2016—the date Shonka upheld her termination. Accordingly, the Court will construe Plaintiff's complaint as alleging discrimination and retaliation when Shonka effectively terminated Plaintiff by upholding Massey's decision on September 14, 2016.

[26]    Plaintiff does not argue a mixed-motive theory in her response to the City's motion for summary judgment. However, in her Second Amended Complaint, Plaintiff makes a passing reference to a mixed-motive theory of race discrimination. (See Doc. 19 at ¶¶ 74, 96.) Because Plaintiff has only made a passing reference to a mixed-motive theory and has failed to address the theory in her response to the City's motion for summary judgment, it would not be improper for the Court to only consider her discrimination claims under a single-motive theory. See Smith v. Vestavia Hills Bd. of Educ., 791 F. App'x 127, 130 (11th Cir. 2019) (citing Keaton v. Cobb Cty.,

Plaintiff also alleges that she has provided direct evidence of discrimination. (Doc. 53 at 3-5.) The Court will address Plaintiff's arguments on direct evidence and each theory of discrimination in turn.

A.   Direct Evidence of Discrimination

First, Plaintiff contends that she has presented direct evidence that the City discriminated against her based on her race. (Id. at 3-5.) "Direct evidence of employment discrimination is evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the plaintiff on the basis of a protected personal characteristic." Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999). "Evidence is direct when it is sufficient to prove discrimination without inference or presumption." Clark, 990 F.2d at 1223 (citing Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989)). Thus, "[o]nly the most blatant remarks whose intent could only be to discriminate constitute direct evidence." Clark, 990 F.2d at 1223.

Plaintiff claims that Judge Cornwell-Williams's "attitudes about race" and comments about race are direct evidence of discrimination. (Doc. 53 at 3-5.) Under a generous reading of Plaintiff's response, Plaintiff seems to rely on several

---

No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)) ("[A] plaintiff cannot make only a 'passing reference to a mixed-motive theory' to sufficiently raise the issue."). Nevertheless, the Court will address both theories of discrimination.

statements by Judge Cornwell-Williams as direct evidence of discrimination, including: (1) Judge Cornwell-Williams's comments to Plaintiff about the number of black people in the Clerk's Office; (2) Judge Cornwell-Williams's comment that Plaintiff needed to hire more white people; and (3) Judge Cornwell-Williams's accusation that Plaintiff is racist.[27] (Id. at 5.) Plaintiff argues that these statements constitute direct evidence that the City discriminated against her because the City only investigated her and terminated her after Judge Cornwell-Williams requested that it do so. (Id. at 6.) After careful review of the record, the Court finds that Plaintiff has failed to present direct evidence of discrimination.

When a plaintiff offers statements as direct evidence of discrimination, "[t]he proffered statements must both 'reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision.' " E.E.O.C. v. TBC Corp., 889 F. Supp. 2d 1368, 1375 (S.D. Ga. 2012) (quoting Bernstein v. Sephora, 182 F. Supp. 2d 1214, 1217 (S.D. Fla. 2002)). The "biased statement by a decision-maker must be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." Williamson v. Adventist Health Sys/Sunbelt, Inc., 372 F. App'x 936, 940 (11th

---

[27]   The Court notes that it had difficulty discerning which evidence Plaintiff believed constituted direct evidence. However, the Court generously construed Plaintiff's response to refer to the above-mentioned statements as direct evidence of discrimination.

Cir. 2010) (citing Damon v. Fleming Supermarkets of Fla., Inc.,
196 F.3d 1354, 1358-59 (11th Cir. 1999)); TBC Corp., 889 F. Supp.
2d at 1375 (citing Williamson, 372 F. App'x at 940) ("A biased
statement, separate in time from the employment decision under
challenge, is not direct evidence of discrimination."); Minhngoc
P. Tran v. The Boeing Co., 190 F. App'x. 929, 932 (11th Cir. 2006)
(finding that a supervisor calling the plaintiff a "stupid Asian"
was not direct evidence of discrimination because the comment
"[did] not specifically address, nor was it made in the context
of, Plaintiff's termination from employment.").

In this case, Judge Cornwell-Williams's comments are not
direct evidence that the City discriminated against Plaintiff.
Judge Cornwell-Williams's comments were not made in the context of
or concurrently with the decision to investigate Plaintiff or the
decision to terminate Plaintiff's employment. Although Judge
Cornwell-Williams's comments could indicate that she harbored
racial animus towards the number of black employees in the Clerk's
Office, none of her alleged comments specifically addressed the
complaint she filed against Plaintiff, the City's investigation of
Plaintiff, or the City's termination of Plaintiff's employment.
See Morrison v. City of Bainbridge, Ga., 432 F. App'x 877, 880
(11th Cir. 2011) ("Although one could infer from [the supervisor's]
statement that he harbored an animus toward older workers, it does
not unambiguously suggest that [the plaintiff] was terminated
because of her age."); Damon, 196 F.3d at 1358-59 (finding that a

decision-maker's comment that "what the company needed was aggressive young men . . ." was not direct evidence of age discrimination because "the comment still requires [the court] to infer that [the employer's] interest in promoting young men motivated his decision to terminate [the plaintiff]"). At most, Judge Cornwell-Williams's statements about the racial makeup of the Clerk's Office could be used to infer that she filed her complaint based, in part, on Plaintiff's race; however, the need for an such inference would constitute circumstantial evidence. Clark, 990 F.2d at 1223 (citing Carter, 870 F.2d at 581-82).

The United States District Court for the Middle District of Florida addressed similar circumstances in Boyce v. Belden, No. 3:99-CV-126(DF), 2002 WL 171697, at *1 (M.D. Ga. Jan. 30, 2002). In Boyce, the district court considered whether statements made by the plaintiff's supervisor, the superintendent, constituted direct evidence of discrimination. 2002 WL 171697, at *1. The plaintiff, a black female, was hired as the principal of a predominantly white elementary school. Id. During the plaintiff's employment, the superintendent made several comments to the plaintiff about racial tension in the school. Id. For example, the superintendent stated that the plaintiff needed to hire a white male as vice principal "for the community" and that the school was no longer a "lily-white" school. Id. The superintendent also stated that the school should not pursue an African American studies program because the plaintiff's appointment as principal had created too much racial

34

tension. Id. Subsequently, the school board voted not to renew the plaintiff's contract and transferred her to another school as a teacher. Id. at *4. The plaintiff alleged that the superintendent and the county discriminated against her based on her race and argued that the superintendent's comments were direct evidence of discrimination. Id. In considering the plaintiff's argument, the district court stated:

> While it is true that the statements cited by Plaintiff might be used to show that [the defendant superintendent] perceived that racial tensions did exist at Walker Park, none of these statements shows that Defendant Walton County actually made any employment decisions because of Plaintiff's race. At most, statements might be used to infer that Defendant Walton County transferred Plaintiff to mitigate these tensions; however, to make such an inference would be to treat the statements as indirect.

Id. at *5. The district court further noted that "because the superintendent was not a final decision maker as to the transfer of [the plaintiff], her comments cannot serve as direct evidence of discrimination." Id.

Similar to the superintendent in Boyce, Judge Cornwell-Williams made comments about the racial makeup of the Clerk's Office, however, none of her statements show that the City made employment decisions because of Plaintiff's race. In addition, Judge Cornwell-Williams was not a final decision-maker in the City's decision to investigate or terminate Plaintiff. Cutter made the decision to initiate the investigation (Doc. 42, Attach. 8 at 2) and Massey and Shonka made the decision terminate Plaintiff's employment (Doc. 44, Attach. 2 at 2). While Judge Cornwell-Williams

did request that the City investigate Plaintiff (Doc. 42, Attach.
4 at 3), her request was not the sole basis for the investigation.
The City has shown that it investigated Plaintiff because Plaintiff
walked out of Judge Cornwell-Williams's courtroom, because Perry-
Brown alleged that Plaintiff was retaliating against her, and
because Plaintiff's communication and administrative oversight
issues continued to "negatively impact Court operations." (Doc.
42, Attach. 8 at 2.) Plaintiff has also failed to provide any
evidence that Judge Cornwell-Williams had any involvement with
Massey or Shonka's decisions to terminate Plaintiff.[28] Accordingly,

---

[28]   In her response, Plaintiff vaguely alleges a "cat's paw"
theory of discrimination. Specifically, Plaintiff argues that
Judge Cornwell-Williams's alleged racial animus should be
"imputed" to the decision-makers (Cutter, Massey, and Shonka)
because the City blindly followed Judge Cornwell-Williams's order
to investigate Plaintiff and Plaintiff's termination was based on
the findings of the investigation. (Doc. 53 at 5.) "When a claim
involves an adverse employment action that occurs based on a biased
recommendation by a party without decisionmaking authority, a
plaintiff can establish liability under the cat's paw theory."
Duncan v. Alabama, 734 F. App'x 637, 639 (11th. Cir. 2018) (citing
Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir.
1999)). "Under that theory, if the decision-making party followed
the biased recommendation without independently investigating the
complaint—essentially acting as a rubber stamp of the biased
recommendation—then the recommender's discriminatory animus
is imputed to the decisionmaker." Id. "However, the plaintiff must
prove that the discriminatory animus behind the recommendation,
and not the identified employee misconduct, was an actual cause of
the adverse employment action." Id. "When an employer makes an
effort to independently investigate before making an adverse
employment decision, it should not be held liable for another
employee's hidden discriminatory motives." Duncan, 734 F. App'x
at 639 (citing Llampallas v. Mini-Circuits, Lab., Inc., 163 F.3d
1236, 1249-50 (11th Cir. 1998)).
     Plaintiff cannot establish liability under the cat's paw
theory. First, the City decided to investigate Plaintiff because
of the ongoing administrative issues within Recorder's Court,
because Perry-Brown alleged that Plaintiff retaliated against her,

the Court finds that Plaintiff has failed to provide direct evidence of discrimination.

B. Single-Motive Theory of Discrimination

Next, Plaintiff contends that she can prove race discrimination under a single-motive theory. When a plaintiff attempts to prove discrimination under a single-motive theory based on circumstantial evidence, the Court employs the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Under the McDonnell Douglas framework, the

_____

and because Judge Cornwell-Williams alleged that Plaintiff walked out of her courtroom. Plaintiff has provided no evidence that the City merely "rubber stamped" Judge Cornwell-Williams's request that the City investigate Plaintiff. Second, the City terminated Plaintiff's employment only after an independent investigation that involved interviews of forty-seven current and former employees. Bowen also interviewed both Judge Cornwell-Williams and Plaintiff as part of the investigation. Plaintiff has not presented evidence that Judge Cornwell-Williams influenced the investigation or that Massey or Shonka received any recommendations from Judge Cornwell-Williams. Additionally, Massey and Shonka based their decisions to terminate Plaintiff on non-discriminatory reasons—Plaintiff's violation of City policies and the need for new leadership in the Clerk's Office. See Anterio v. City of High Springs Fla., 762 F. App'x 891, 899 (11th Cir. 2019) ("[T]he cat's paw theory does not apply under our precedent because [the city manager] conducted an independent investigation into [the supervisor's] allegations and made an independent decision to terminate [the plaintiff] based on non-discriminatory reasons."). See also Zinnerman v. Worthington Indus., Inc., 764 F. App'x 845, 847 (11th Cir. 2019) (finding that the employer was not liable under a cat's paw theory where the plaintiff presented no evidence that the decisionmaker was influenced by another employee's discriminatory animus, even if the decision maker considered the employee's discriminatory opinions). Accordingly, the Court finds that Judge Cornwell-Williams's alleged racial animus cannot be imputed to the City.

plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. If a plaintiff can demonstrate the elements of a prima facie case, then a burden of production falls to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Lewis v. City of Union City, Ga., 918 F.3d 1213, 1221 (11th Cir. 2019). If the employer articulates a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to demonstrate that the employer's stated reason was a pretext for discrimination. Id. The Court will address the steps of the McDonnell Douglas framework in turn.

### 1. Prima Facie Case

Under the McDonnell Douglas framework Plaintiff must first establish a prima facie case of race discrimination. To establish a prima facie case of discrimination, Plaintiff must prove four elements: (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably.[29] Lewis, 918 F.3d at 1220-21. The parties do not dispute that Plaintiff, a black female, is a member of a protected class,

---

[29] A plaintiff can also establish the fourth prong of a prima facie case by showing that she "was replaced by someone outside of the protected class." Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004). Plaintiff, however, has not presented any evidence that she was replaced by an employee outside of her protected class.

was qualified for the job, and suffered an adverse employment action when the City terminated her employment. The City argues that it is entitled to summary judgment because Plaintiff has failed to identify a similarly situated comparator who was treated more favorably. (Doc. 37 at 20.)

The United States Court of Appeals for the Eleventh Circuit has held that the comparator analysis must be conducted at the prima facie stage of the McDonnell Douglas burden-shifting framework and that "a plaintiff asserting an intentional-discrimination claim under McDonnell Douglas must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.' " Lewis, 918 F.3d at 1218. Generally, a similarly situated comparator will have "engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's disciplinary history." Id. at 1227-28.

In her response, Plaintiff identifies Judge Cornwell-Williams as a comparator.[30] It is undisputed that Judge Cornwell-Williams,

---

[30]   In her deposition, Plaintiff actually dismissed Judge Cornwell-Williams as a comparator and alleged that she was similarly situated to Buddy Clay, the former Clerk of Recorder's Court, and Beth Robinson, the former Human Resources Director for the City. (Doc. 39, Attach. 3 at 204-205, 251.) However, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on

a white female, is outside of Plaintiff's protected class. Plaintiff argues that she and Judge Cornwell-Williams are similarly situated because she and Judge Cornwell-Williams had the same supervisor—Chief Judge Stokes—and the same duties—managing Recorder's Court and serving the public. (Doc. 53 at 7.) Plaintiff also argues that the City treated Judge Cornwell-Williams treated more favorably because Plaintiff filed a "number of legitimate complaints" against Judge Cornwell-Williams and the City did not investigate her complaints. (Id. at 7-8.) Plaintiff, however, does not argue that Judge Cornwell-Williams is subject to the same employment policies nor does Plaintiff argue that Judge Cornwell-Williams engaged in the same misconduct as Plaintiff. Specifically, Plaintiff does not allege that Judge Cornwell-Williams violated City policies or failed to effectively oversee Recorder's Court operations.

The Court finds that Plaintiff has failed to show that Judge Cornwell-Williams and Plaintiff are similarly situated in all material respects as required by Lewis. Plaintiff and Judge

---

summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th. Cir. 1995) (citing Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990)). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th. Cir. 1995) (citing Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001) (noting that arguments not raised in response to motion for summary judgment are deemed abandoned). Accordingly, the Court will only consider Plaintiff's comparator arguments alleged in her response to the City's motion for summary judgment.

Cornwell-Williams occupied distinct positions which required the performance of different responsibilities. See Horn v. United Parcel Servs., Inc., 433 F. App'x 788, 794 (11th Cir. 2011) ("[T]he district court did not err by rejecting [the plaintiff's] comparators on the basis of material differences in rank, responsibilities, and supervisors."); Hill v. Emory Univ., 346 F. App'x 390, 395 (11th Cir. 2009) (holding that plaintiff and his purported comparator were not similarly situated in all material respects because their respective jobs required the performance of different responsibilities). As Clerk, Plaintiff oversaw the administrative tasks of Recorder's Court, the hiring and firing of Clerk's Office staff, and the communication between the judges, law enforcement officials, attorneys, court personnel, and staff. (Doc. 37, Attach. 1 at ¶ 24; Doc. 53, Attach. 11 ¶ 24.) Plaintiff was also responsible for facilitating the exchange of information between Recorder's Court, the public, and other courts. (Id.) As the City highlights, Plaintiff's primary duty was to support the Recorder's Court judges in managing their dockets and to oversee the completion of administrative tasks. Unlike Plaintiff, Judge Cornwell-Williams held judicial responsibilities, was elected to her position, and only managed her own dockets.

"[D]ifferences in job ranks . . . are not, in and of themselves, dispositive as to whether the two individuals may be compared for the purposes of evaluating a discrimination claim . . . ." Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir.

2008). However, rank matters because "the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 (11th Cir. 2011) (citing Lathem v. Dep't of Child. & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999)). Plaintiff argues that the City treated Judge Cornwell-Williams more favorably by applying employment policies—namely, the City's investigation policy—differently to Judge Cornwell-Williams than to Plaintiff. Specifically, Plaintiff alleges that the City ignored Plaintiff's complaints lodged against Judge Cornwell-Williams, but the City investigated Judge Cornwell-Williams's complaints lodged against Plaintiff. (Doc. 53 at 7-8.) However, Plaintiff has not shown that she and Judge Cornwell-Williams engaged in similar misconduct or that the City had supervisory authority over Judge Cornwell-Williams. While Plaintiff alleges that she filed several complaints against Judge Cornwell-Williams, Plaintiff does not specify what these complaints alleged. Regardless, the evidence shows that the City had the authority to investigate Plaintiff, but did not have the authority to investigate Judge Cornwell-Williams. (Doc. 38 at ¶ 8 ("The City cannot discipline, terminate, or remove elected judges from office."); Doc. 41, Attach. 6 at 2 ("Please remember that the misconduct of a Judge is reported to the Chief Judge with a copy to [Cutter]."").) Accordingly, even if Judge Cornwell-Williams engaged in similar misconduct, the City could not treat Judge

Cornwell-Williams more favorably than Plaintiff if it had no supervisory authority to investigate or discipline Judge Cornwell-Williams. Because Plaintiff has failed to present a proper comparator, the Court finds that Plaintiff has failed to establish a prima facie case of discrimination.[31]

### 2. Legitimate, Nondiscriminatory Reasons

Even if Plaintiff had established a prima facie case, the City has proffered a legitimate, nondiscriminatory reason for her termination. Under the McDonnell Douglas framework, once a plaintiff establishes a prima facie case of discrimination, an employer "must articulate a legitimate, nondiscriminatory reason

---

[31]   A plaintiff does not necessarily have to establish the existence of a comparator employee to survive summary judgment. Instead, a plaintiff can "survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' " Id. (quoting Silverman v. Bd. of Educ., 637 F.3d 729,734 (7th Cir. 2011)). Plaintiff does not allege that she has presented a convincing mosaic of circumstantial evidence; however, even if she had alleged a convincing mosaic theory, the record is insufficient to allow a jury to infer that the City intentionally discriminated against Plaintiff. Plaintiff has not presented any evidence that the City "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." Smith, 644 F.3d at 1341. Moreover, the evidence does not establish a pattern of discipline by the City against black employees— Plaintiff has provided no evidence that the City chose not to investigate complaints against other white employees which it had supervisory authority over. Additionally, Plaintiff has not presented any evidence that Massey or Shonka considered Plaintiff's race at all in their decision to terminate Plaintiff's employment.

for the challenged employment action." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). "However, the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." Id.

The City alleges that it terminated Plaintiff's employment because she violated City policies, demonstrated poor leadership, and "perpetuated and exacerbated" the "dysfunction of Recorder's Court . . . ." (Doc. 37 at 22-24.) The Court finds that the City has met its burden under the McDonnell Douglas framework. See Cusick v. Yellowbrook, Inc., 607 F. App'x 953, 955 (11th Cir. 2015) (finding "deficient leadership skills" a legitimate, non-discriminatory reason for an adverse employment action); Benjamin v. SNF Holding Co., 602 F. App'x 758, 762 (11th Cir. 2015). See also Morrison, 432, F. App'x at 881 (finding creation of "an unsatisfactory and conflict-driven work environment" was a legitimate, nondiscriminatory reason for the plaintiff's termination). Because the City has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination, the burden is on Plaintiff to demonstrate that the City's stated reasons are pretext and the true reason for her termination was discrimination. See Lewis, 918 F.3d at 1221.

### 3. Pretext

When reviewing an employer's given reason for terminating a plaintiff's employment, "our sole concern is whether unlawful discriminatory animus motivated the decision." Alvarez v. Royal

44

Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). In conducting this analysis, courts, however, are not to function as a "super-personnel department." Alvarez, 610 F.3d at 1266. In fact, the law is clear that "Title VII does not allow federal courts to second-guess nondiscriminatory business judgments . . . ." Flowers, 803 F.3d at 1338. Thus, "an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." Damon, 196 F.3d at 1363 n.3. "Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.' " Id. (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)).

At this point, the Court notes that Plaintiff's response brief plainly fails to address whether the City's proffered reasons for her termination are pretext. Plaintiff has not shown, or argued, that the City actually terminated her employment because of her race. Although the City specifically raises the argument that Plaintiff cannot show pretext, Plaintiff does not address this argument in her response brief. The Eleventh Circuit has made clear that

> [i]n opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

_Edmondson v. Bd. of Trustees of Univ. of Ala._, 258 F. App'x 250, 253 (11th Cir. 2007) (citing _Resolution Trust Corp. v. Dunmar Corp._, 43 F.3d 587, 599 (11th cir. 1995)). Accordingly, summary judgment is appropriate on Plaintiff's race discrimination claims because she failed to address pretext in her response. _See Wilkerson v. Grinnell Corp._, 270 F.3d 1314, 1322 (11th Cir. 2001) (noting that arguments not raised in response to motion for summary judgment are deemed abandoned); _Tighe v. Worldspan, LP_, No. 1:08-CV-1889, 2010 WL 11500518, at *32, (N.D. Ga. Jan. 20, 2010), report and recommendation adopted by, No. 1:08-CV-1889-RLV, 2010 WL 11507853, at *1, (N.D. Ga. Feb. 25, 2010) ("Plaintiff does not address pretext in her response brief . . ., and has, therefore, failed to raise a genuine factual issue as to whether Defendant's proffered reasons are pretextual.").

Even if the Court broadly construed other sections of Plaintiff's response brief as arguments related to pretext, Plaintiff has failed to show that the City's proffered reasons are pretextual. For example, in her discussion of direct evidence, which offers slightly more argument than her discussion of circumstantial evidence, Plaintiff seems to argue that the City's reasons for her termination—that she failed to effectively perform her job duties and perpetuated the interpersonal conflicts affecting Recorder's Court—are pretext because the issues affecting Recorder's Court existed prior to Plaintiff's employment as Clerk. (Doc. 53 at 3-5.) Plaintiff also seems to contend both

Massey and Shonka based their decisions to terminate Plaintiff's employment on a racially motivated investigation influenced by Judge Cornwell-Williams. (Id. at 5-6.) The Court finds that these arguments are unsupported.

To begin, the fact that issues affected Recorder's Court prior to Plaintiff's employment does not show that the City's proffered reasons are pretext. The City does not contend that Plaintiff created the divide between Chief Judge Stokes and Judge Cornwell-Williams; instead, the City argues that Plaintiff deepened the division between the judges and failed to sufficiently oversee the administrative operations of Recorder's Court. The record supports the City's proffered reasons. Plaintiff testified that one of her essential job functions was communicating regularly with the judges to facilitate court operations. (Doc. 39, Attach. 3 at 38.) As such, Plaintiff was expected to ensure that Recorder's Court functioned efficiently and effectively, regardless of any disputes between the judges. Yet, Plaintiff has failed to produce evidence that she fulfilled her duties, that Recorder's Court was operating effectively, or that she facilitated communication between the judges. In fact, Plaintiff admitted that she: (1) refused to meet with Judge Cornwell-Williams one-on-one; and (2) walked out of Judge Cornwell-Williams' courtroom despite the Judge's request that she stay in the courtroom. (Doc. 39, Attach. 3 at 79-80, 89-90, 116.)

While the investigation uncovered misconduct by Chief Judge Stokes and Scott-Brown that occurred prior to Plaintiff's employment, the City's failure to excuse Plaintiff's policy violations and refusal to serve the needs of Judge Cornwell-Williams "in light of those circumstances does not mean that its actions were discriminatory." Williams v. Housing Auth. Of Savannah, Inc., No. 20-10809, 2020 WL 6335946, at *6 (11th Cir. Oct. 29, 2020). As Clerk, Plaintiff was responsible for ensuring Recorder's Court and the Clerk's Office operated effectively. Yet, as the Superior Court of Chatham County noted in its Writ of Prohibition, "[Plaintiff] and personnel within the clerk's office have interfered with the ability of one of the judges to carry out her duties" and "[t]he report plainly describes a clerk's office that, at best, is unable to operate efficiently, and, at worst, is actively obstructing justice." (Doc. 43, Attach. 4 at 1-2.) Thus, the evidence supports the City's belief that Plaintiff perpetuated the problems within Recorder's Court and Plaintiff has not presented any evidence to rebut this finding. It is not the Court's job to second-guess the City's business decision to seek new leadership in the Clerk's Office. See Alvarez, 610 F.3d at 1266 (stating that "it is not our role to second-guess the wisdom of an employer's business decisions").

As for Plaintiff's argument that the City's reasons are pretext because Massey and Shonka relied on a racially motivated investigation, the Court finds that this argument is unsupported.

48

At no point does Plaintiff challenge Massey or Shonka's honest belief that Plaintiff violated City policies and failed to effectively perform her duties as Clerk. See Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.' "). Plaintiff also provides no evidence that either decision-maker had a racially discriminatory motive when terminating her employment.

Even if Massy and Shonka reviewed the Report, Plaintiff has not provided any evidence that the Report is discriminatory. Notably, Plaintiff, in her response, does not dispute the findings of the Report, including that Judge Stokes's feud with Judge Cornwell-Williams was potentially based on race and that those employees on "Judge Stokes's side," including Plaintiff, treated white employees on "Judge Cornwell-Williams's side" unfavorably. (Doc. 42, Attach. 9 at 18-19, 20.) Although the Report does conclude that the conflict between Chief Judge Stokes and Judge Cornwell-Williams was potentially based on race and that Plaintiff tolerated race as a factor in work-related matters, Plaintiff has not produced any evidence that Massy or Shonka considered the racial tension in Recorder's Court as a reason to terminate Plaintiff's employment.

Finally, Plaintiff is incorrect that Massey and Shonka made their decisions to terminate Plaintiff based only on the findings

49

of the Report. The facts of this case show that Massey did review the Report, but Massey relied primarily on his personal experiences with Plaintiff and his opinion that Plaintiff "was not an effective administrator" and "[did not] have good working knowledge of Recorder's Court operations . . . ." (Doc. 40, Attach. 8 at ¶ 6.) Massey also relied on the fact that "bottlenecks in shared court operations originated in Recorder's Court under [Plaintiff's leadership]" and that Massey "received complaints from law enforcement personnel, attorneys, and citizens about poor recordkeeping . . ." that led to delays in court. (Doc. 40, Attach. 8 at ¶¶ 8-9.) Shonka relied, in part, on the evidence that Massey and Plaintiff presented at the appeal hearing in his determination that "the court [was] not functioning as it should be and that new leadership [was] needed."[32]   (Doc. 44, Attach. 1 at ¶ 6.)

---

[32]   To the extent Plaintiff challenges the sufficiency of the investigation, Plaintiff has provided no evidence to support her argument. The record shows that Cutter initiated the investigation after two complaints were filed against Plaintiff and because of the ongoing administrative issues affecting the operation of Recorder's Court. (Doc. 42, Attach. 8 at 2.) The City has also produced evidence that the investigation was conducted by an independent investigator and that the investigator interviewed forty-seven individuals, including Plaintiff, about Plaintiff's tenure as Clerk and the conflicts between Recorder's Court personnel. (Doc. 42, Attach. 9 at 3, 5.) In the Court's view, despite any racially-charged comments by Judge Cornwell-Williams, Cutter made an independent decision to investigate Plaintiff and Bowen conducted a sufficient investigation into Plaintiff's misconduct and the conflicts between Recorder's Court employees. Noticeably absent from Plaintiff's response is any argument or evidence that Cutter was racially motivated in her decision to initiate the investigation or that Bowen was racially motivated in conducting the investigation. Additionally, the Report's finding that racial tension existed within the Clerk's Office does not prove that the investigation or the Report were biased. Therefore,

Ultimately, Plaintiff has failed to show, or even argue, that Massey or Shonka considered her race at all in their decisions to terminate Plaintiff's employment. At most, the evidence shows that Massey and Shonka were made aware, through the Report, of racial tension within Recorder's Court; however, Massey and Shonka chose to terminate Plaintiff because she violated City policies, failed to effectively manage her duties as Clerk, and failed to facilitate working relationships within Recorder's Court. "It is not a violation of Title VII for an employer to consider a non-racial characteristic of the employee, in this case Plaintiff's relationship with her co-workers, even if such consideration may have a tenuous racial component." Eller v. Colvin, No. CV414-202, 2016 WL 1276445, at *7 (S.D. Ga. Mar. 30, 2016) (citing Chapman, 229 F.3d at 1035). Accordingly, the evidence is insufficient to permit a reasonable inference that Plaintiff's race was the true reason for the City's decision to terminate her employment.

## C. Mixed-Motive Theory of Discrimination

Finally, Plaintiff alleges a mixed-motive theory of discrimination. Under a mixed-motive theory of discrimination, an employee can succeed "by showing that illegal bias . . . 'was a

---

Plaintiff has not provided any evidence that the investigation was discriminatory or that the City's proffered reasons are pretext based on the sufficiency investigation. See Ross v. City of Perry, Ga., 396 F. App'x 668, 670-71 (11th Cir. 2010) (finding the plaintiff did not show pretext by arguing, without evidence, that the investigation was a sham); Rowell v. Winn Dixie, No. 07-0433-WS-M, 2008 WL 4369003, at *11 n.29 (S.D. Ala. Sept. 23, 2008) (finding that the plaintiff failed to show pretext by challenging the sufficiency of an investigation).

motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." <u>Quigg</u>, 814 F.3d at 1235. "The summary-judgment inquiry is simply whether a reasonable jury could conclude that the plaintiff's [protected characteristic] was a motivating factor for the adverse employment action." <u>Williams</u>, 2020 WL 6335946, at *4 (citing <u>Quigg</u>, 814 F.3d at 1239-40.)).

Although Plaintiff raised a mixed-motive claim in her Amended Complaint (Doc. 19 at ¶¶ 74, 96), she failed to raise any argument related to her mixed-motive claim in her response to the City's motion for summary judgment. "Because [Plaintiff] [bears] the burden of formulating the arguments she wishe[s] for the [C]ourt to address, the [C]ourt [is] not required to evaluate the evidence under a theory of discrimination that she d[oes] not raise." <u>Williams</u>, 2020 WL 6335946, at *5 (citing <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 598 (11th Cir. 1995)). Regardless, the evidence, even when viewed in the light most favorable to Plaintiff, is insufficient to conclude that Massey and Shonka's decisions to terminate Plaintiff's employment was motivated by her race.

Plaintiff provides no evidence or argument that Massey or Shonka considered her race in their decision to terminate her employment. The Report concludes that race was a "potential" factor in the feud between Chief Judge Stokes and Judge Cornwell-Williams and that Plaintiff potentially excluded Judge Cornwell-Williams from Clerk's Office matters based on Judge Cornwell-Williams's

race. (Doc. 42, Attach. 9 at 11, 18.) It is undisputed that both Massey and Shonka reviewed the Report before making their decisions to terminate Plaintiff's employment. However, Plaintiff has not pointed to any evidence that Massey or Shonka made their decisions based on the Report's conclusion that race fueled the internal conflicts within Recorder's Court. As previously discussed, the evidence shows that Massey and Shonka were aware of racial tensions within Recorder's Court and decided that Plaintiff's inadequate administration of the court's operations only deepened internal conflicts. Even if Shonka partially relied on the City's determination that Plaintiff violated City policies by "tolerat[ing] race as a factor in some Recorder's Court work-related matters" (Doc. 42, Attach. 13 at 5), this evidence does not show that Plaintiff's race motivated her termination; it shows that Shonka believed Plaintiff was not sufficiently managing issues affecting the Clerk's Office in accordance with City policies. Accordingly, the evidence does not permit a reasonable inference that the decision to terminate Plaintiff's employment was motivated, even in part, by her race. As a result, the City's motion for summary judgment (Doc. 37) is **GRANTED** on Plaintiff's race discrimination claims.

III.   <u>RETALIATION CLAIMS</u>

Plaintiff also claims that the City unlawfully retaliated against her after she complained about Judge Cornwell-Williams's racial discrimination in violation of Title VII and 42 U.S.C.

§ 1981. (Doc. 19 at 14, 18.) Retaliation claims under 42 U.S.C. § 1981 are analyzed under the same framework as Title VII claims. Gogel v. Kia Motors Mfg, of Ga., Inc., 967 F.3d 1121, 1134 (11th Cir. 2020). Title VII prohibits an employer from retaliating against "any . . . employee[] . . . because [s]he has opposed any practice made an unlawful employment practice" by Title VII, "or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

"A claim for retaliation under Title VII that relies on circumstantial evidence, such as this one, follows the same McDonnell Douglas burden-shifting analysis that applies to Title VII discrimination cases." Clark v. Bd. of Regents of Univ. Sys. Of Ga., 243 F. Supp. 3d 1367, 1375 (S.D. Ga. 2017) (citing Brown v. Ala. Dept. of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010)). Under the McDonell Douglas framework, the plaintiff must first establish a prima facie case of retaliation. Id. "If a plaintiff establishes a prima facie case, then the finder of fact must presume retaliation and the defendant has the burden of rebutting that presumption by producing a legitimate reason for the adverse employment action." Clark, 243 F. Supp. 3d at 1375 (citing Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999)). "If the defendant offers legitimate reasons, the presumption of retaliation disappears," and the plaintiff must show that the proffered reasons were merely pretext for

54

retaliation. Id. "Moreover, the employee must ultimately prove 'the desire to retaliate was the but-for cause of the challenged employment action.' " Riggin v. United States Dep't of Air Force, 243 F. Supp. 3d 1324, 1330 (S.D. Ga. 2017) (quoting Booth v. Pasco Cty., Fla., 757 F.3d 1198, 1207 (11th Cir. 2014)).

A.   Prima Facie Case

In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924 (11th. Cir. 2018). The Court notes that Plaintiff, in her response, only addresses whether she engaged in statutorily protected activity. (Doc. 53 at 8.) Nevertheless, the Court will analyze each factor to determine whether Plaintiff can establish a prima facie case of retaliation.

1. Statutorily Protected Activity

First, Plaintiff must show that she engaged in statutorily protected activity. "A plaintiff engages in statutorily protected activity when [she] opposes an employment practice that [she] has a good faith, reasonable basis to believe is unlawful." Diamond v. Morris, Manning & Martin, LLP, 457 F. App'x 844, 846 (11th Cir. 2012) (citing Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1213 (11th Cir. 2008)). Plaintiff argues that she engaged in statutorily

protected activity in several instances, including: (1) "any time she made a complaint to the City" or Chief Judge Stokes about Judge Cornwell-Williams's alleged racial discrimination and harassment; (2) her filing of an EEOC charge on July 29, 2016; and (3) her filing of an EEOC charge on December 21, 2016. (Doc. 53 at 8.)

In her response, Plaintiff does not specify which complaints she considers protected activity; instead, Plaintiff argues generally that all of her complaints constituted protected activity.[33] From the Court's review of the record, two of Plaintiff's e-mails to Cutter could constitute statutorily protected activity. First, on August 19, 2015, Plaintiff sent an e-mail to Cutter stating that Plaintiff believed Judge Cornwell-Williams's "daily actions are severely disrupting the Court and subjecting staff to inappropriate behavior" and "rise to the level of judicial misconduct." (Doc. 41, Attach. 6 at 2.) Although the August 19 e-mail does not specifically state what behavior Plaintiff considers inappropriate, Plaintiff seems to refer to an e-mail on August 18 to Cutter about Judge Cornwell-Williams allegedly embarrassing another Clerk's Office employee in court.

---

[33] Plaintiff states in her December 21, 2016 EEOC charge that she filed "an internal racial harassment complaint with Stephanie Cutter . . . against Judge Claire Cornell-Williams" in July 2015. (Doc. 44, Attach. 7 at 2.) Plaintiff, however, does not provide this complaint to the Court. Even if Plaintiff filed an internal complaint in July 2015 and this complaint constituted protected activity, the temporal proximity between Plaintiff filing her complaint in July 2015 and the decision to investigate Plaintiff in February 2016 is too attenuated to constitute a prima facie case of retaliation. See Jones v. City of Lakeland, 318 F. App'x 730, 736 (11th Cir. 2008).

(Id. at 3.)   Second, on October 29, 2015, Plaintiff sent an e-mail
to Cutter alleging that that Judge Cornwell-Williams made several
"inappropriate" statements, including that "if she (Judge
Williams) was the Chief Judge and there were so many white people
(like there are blacks now) everyone would be in an uproar" and
that Plaintiff "will be held responsible for the lack of diversity
in our Court." (Doc. 41, Attach. 11 at 2.)

The Court finds that neither of Plaintiff's e-mails
constitute protected activity. In Plaintiff's August 2015 e-mail,
Plaintiff describes disrespectful behavior that embarrassed an
employee and in her October 2015 e-mail Plaintiff describes
statements that made her uncomfortable and generally indicated
Judge Cornwell-Williams harbored some racial animus. Plaintiff,
however, does not allege that Judge Cornwell-Williams engaged in
unlawful employment practices or that Judge Cornwell-Williams
discriminated against Plaintiff or another employee. See Ceus v.
City of Tampa, 803 F. App'x 235, 247 (11th Cir. 2020) (finding
that plaintiff who generally decried "racism" within department
did not engage in protected activity because he did not tie that
assertion to any specific discrimination he or anyone else faced
within the department); Graham v. Mem'l Univ. Med. Ctr., No. CV411-
316, 2013 WL 5444733, at *9 (S.D. Ga. Sept. 30, 2013) (quoting
Webb v. R & B Holding Co., 992 F. Supp. 1382, 1389 (S.D. Fla. 1998)
("It is not enough for the employee merely to complain about . . .
certain behavior of coworkers and rely on the employer to infer

that discrimination has occurred."). Accordingly, the Court finds that Plaintiff only engaged in statutorily protected activity when she filed her EEOC charges on July 29, 2016 and December 21, 2016.[34]

## 2. Adverse Employment Action

Next, Plaintiff must demonstrate that she suffered an adverse employment action. "In order to constitute an adverse employment action for purposes of establishing a prima facie case under Title VII's anti-retaliation provision, the action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable employee from making a discrimination charge." Williams v. Apalachee Ctr., Inc., 315 F. App'x 798, 800 (11th Cir. 2009) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006)). Plaintiff contends that she suffered an adverse employment action when the City upheld her termination on September 14, 2016.[35] (Id. at ¶ 84.)

---

[34] Even if Plaintiff's August 2015 and October 2015 e-mails constituted protected activity, Plaintiff could not show a prima facie case of retaliation. Because of the temporal gap between the complaints and the decision to investigate Plaintiff in February 2016, the Court cannot conclude there is a causal connection between Plaintiff's complaints and the decision to investigate Plaintiff. See Jones, 318 F. App'x at 736 (finding that the district court did not err by concluding that a three month period between the protected activity and the adverse action did not allow a reasonable inference of a causal connection between the protected activity and the retaliatory conduct). Moreover, the connection appears even more attenuated when considering that Plaintiff was not terminated until September 2016.

[35] In Plaintiff's December 21, 2016 EEOC charge, Plaintiff claimed she was terminated on September 14, 2016—the day Shonka upheld her termination.

3. Causal Connection

Finally, Plaintiff must show that a causal connection between her statutorily protected activity and the adverse employment action. "To demonstrate a causal connection between a protected activity and an adverse employment action, the plaintiff must show that: (1) the decisionmakers knew of [the] protected activity; and (2) the protected activity and adverse action were not wholly unrelated." Harris v. Fla. Agency for Health Care Admin., 611 F. App'x 949, 951 (11th Cir. 2015) (citing Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002)). "Once a plaintiff has established his employer's awareness of the protected activity, he can meet the causation burden by showing close temporal proximity between the protected activity and the employer's adverse action, but absent more, mere temporal proximity must be 'very close.' " Adams v. City of Montgomery, 569 F. App'x 769, 774 (11th Cir. 2014) (quoting Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)).

In her response, Plaintiff has not shown, or argued, that there is a causal connection between her statutorily protected activity and her termination. Regardless, the Court finds that, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could infer that there is a causal relation between Plaintiff's July 29, 2016 EEOC charge and her termination.

As an initial matter, Plaintiff's December 21, 2016 EEOC charge cannot be casually related to her termination because

59

Plaintiff was terminated before she filed her December 2016 charge. See Ceus, 803 F. App'x at 249 ("The February 2014 performance evaluation, the March 2014 transfer, and the September 2014 interview cannot be causally related to the 2014 EEOC charge because they occurred before [the plaintiff] filed his 2014 EEOC charge."); Cheatham v. Dekalb Cty., Ga., 682 F. App'x 881, 887 (11th Cir. 2017) ("[T]o be actionable, any retaliatory actions must have occurred after these formal complaints were filed."). Accordingly, to the extent Plaintiff's retaliation claims are premised on her December 2016 EEOC charge, Plaintiff has failed to establish a prima facie case of retaliation.

However, the Court finds that Plaintiff can establish a prima facie case with respect to her July 29, 2016 EEOC charge. The evidence suggests that the City received notice of Plaintiff's EEOC charge on August 4, 2016.[36] (Doc. 44, Attach. 6 at 2.) Approximately one month later, on September 14, 2016, the City terminated Plaintiff's employment. Thus, the period between Plaintiff's protected expression and the adverse action is close enough to create an inference of causation. See Higdon v. Jackson, 393 F.3d 1211, 1211 (11th Cir. 2004) ("A close temporal proximity between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for

---

[36]    The EEOC sent Plaintiff the dismissal and notice of rights on August 4, 2016. According to the notice, the EEOC also mailed a copy to Joy Wilkinson, the City's Director of Human Resources. (Doc. 44, Attach. 6 at 2.)

purposes of a prima facie case." (internal quotations omitted));
Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986)
("The short period of time [one month] between the filing of the
discrimination complaint and the . . . [adverse employment action]
belies any assertion by the defendant that the plaintiff failed to
prove causation."). Accordingly, the Court finds that Plaintiff
can establish a prima facie case of retaliation. Nevertheless,
Plaintiff's retaliation claims still fail because she has failed
to carry her burden under the McDonnell Douglas framework to show
that the City's non-retaliatory reasons for Plaintiff's
termination are pretext.

B.   Nonretaliatory Reasons for Plaintiff's Termination and
     Pretext

"Once the prima facie case is established, it creates a
'presumption that the adverse action was the product of an intent
to retaliate.' " Gogel, 967 F.3d at 1135 (quoting Bryant v. Jones,
575 F.3d 1281, 1308 (11th Cir. 2009)). "The burden of production
then shifts to the employer to rebut the presumption by
articulating a legitimate, non-discriminatory reason for the
employment action." Id. "If the employer produces such a reason,
the presumption is rebutted, and the plaintiff must then
demonstrate that the 'proffered reason was merely a pretext to
mask [retaliatory] actions.' " Id.

As previously discussed, the City has articulated a
legitimate, nonretaliatory reason for Plaintiff's termination.
Specifically, the City contends that Plaintiff was discharged

because she violated City policies and demonstrated poor leadership as the Clerk of Recorder's Court, not because she filed an EEOC charge. (Doc. 37 at 24; Doc. 44, Attach. 2 at 2.) Thus, the City has rebutted the presumption that the adverse employment action was the product of an intent to retaliate. Therefore, to defeat summary judgment, Plaintiff must demonstrate that the City's proffered reason for its decision was merely a pretext for its real reason—Plaintiff's filing of the July 29, 2016 EEOC charge.[37] Gogel, 967 F.3d at 1136.

Plaintiff does not address the City's proffered reason or the pretext analysis in her response. In fact, Plaintiff's response is bare of any argument about her retaliation claims besides her assertion that she engaged in protected activity. "[I]t is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her." Id. Regardless, as discussed above, Plaintiff has failed to provide any evidence that the City's reasons for her discharge are pretext. As a result, the City's motion for summary judgment (Doc. 37) is **GRANTED** on Plaintiff's retaliation claims.

---

[37]   Plaintiff also seems to argue that Massey and Shonka may not have directly retaliated against her for her complaints, but they relied on an investigation in making their decisions that was conducted in retaliation for her complaints. (Doc. 53 at 6.) The Court, however, has addressed this point. Both Massey and Shonka relied on other evidence aside from the investigation and the investigation, from the Court's view, was appropriately conducted. As a result, Plaintiff has not shown that Massey or Shonka somehow adopted any retaliatory views of Judge Cornwell-Williams.

IV.   GEORGIA WHISTLEBLOWER ACT CLAIM

Lastly, the City argues that it is entitled to summary judgment on Plaintiff's claim that the City violated the Georgia Whistleblower Act, O.C.G.A. § 45-1-4. (Doc. 37 at 33.) Because the Court has granted summary judgment on Plaintiff's race discrimination and retaliation claims, no federal cause of action remains in this case. As such, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim under the Georgia Whistleblower Act. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004); see also Gray v. Royal, 181 F. Supp. 3d 1238, 1254 (S.D. Ga. 2016) ("Courts are encouraged to avoid exercising supplemental jurisdiction when original jurisdiction is lacking."). Accordingly, Plaintiff's claim pursuant to the Georgia Whistleblower Act is **DISMISSED WITHOUT PREJUDICE.** Plaintiff may refile this claim in state court.

                              **CONCLUSION**

For the foregoing reasons, the City's Motion for Summary Judgment (Doc. 37) is **GRANTED IN PART** and **DISMISSED IN PART.** Specifically, the City's motion is **GRANTED** on Plaintiff's race discrimination and retaliation claims. However, Plaintiff's claim under the Georgia Whistleblower Act is **DISMISSED WITHOUT PREJUDICE.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _19th_ day of November 2020.

                              _____
                              WILLIAM T. MOORE, JR.
                              UNITED STATES DISTRICT COURT
                              SOUTHERN DISTRICT OF GEORGIA